IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 4:22CR3120 |
| vs. | |
| TANNER HUDSON, | MEMORANDUM AND ORDER |
| Defendant. | |

This matter is before the Court on Defendant's Amended Motion to Suppress (Filing No. 71), the Magistrate Judge's Findings and Recommendation (Filing No. 100) on that motion, and Defendant's Objection (Filing No. 102) to the Findings and Recommendation. The Court will overrule Defendant's Objection, adopt the Findings and Recommendation, and deny the Amended Motion to Suppress.

**BACKGROUND**

The underlying facts of this case are detailed in the Magistrate Judge's Findings and Recommendation, so the Court will not belabor them here. (Filing No. 100.) And it need not do so in any event, because Defendant's Objection is aimed only at "the legal conclusion" the Magistrate Judge reached—he does not dispute any factual findings. (Filing No. 102.) Nevertheless, a brief recitation of the key facts relative to Defendant's Objection provides helpful context.

In April 2022, Defendant was arrested on an unrelated charge and brought to the Law Enforcement Center in Kearney, Nebraska. (Filing No. 97.) Kearney Police Department Investigator Cody Bolte happened to be investigating the apparent overdose of Defendant's friend Brady Rohde, so the arresting officer—Officer Hibberd—produced Defendant for an interview. Investigator Bolte told Defendant that he was "tasked with looking into" Mr. Rohde's "overdose"

1

and wanted to speak to his friends—like Defendant—to "[s]ee [ ] if [he] kn[e]w anything or what happened[.]" (Filing No. 92, Ex. 102 at 4.) Because Defendant was under arrest on the unrelated charge, Investigator Bolte read Defendant his *Miranda* rights at the outset of the interview. (Filing No. 97 at 5-6; Filing No. 92, Ex. 102 at 9.) Defendant then signed a form indicating that he "underst[ood]" each of those rights and was willing to "waive" them and "willingly make a statement." (Filing No. 92, Ex. 1.) As the transcript of the interview shows, Investigator Bolte did not make any threats or promises toward Defendant to induce him to waive his *Miranda* rights, nor did Defendant ask any questions suggesting he did not understand his rights or the effect of waiving them. (Filing No. 97 at 6.)

Defendant finished recounting his version of events around the halfway mark of the interview. At that point, Investigator Bolte—having already heard a contradictory account of some key facts[1]—expressed doubt that Defendant had been entirely truthful. (Filing No. 97 at 7; Filing No. 92, Ex. 102 at 23.) Specifically, Investigator Bolte took issue with Defendant's assertions that someone else gave Mr. Rohde the pill that hospitalized him around six months before the night he took it. (Filing No. 92, Ex. 102 at 23-26.) Investigator Bolte (repeatedly) reminded Defendant that his "best friend" Mr. Rohde was "laying in a hospital, brain dead" because of that pill and told him that he "kn[ew] who gave [Mr. Rohde] the pill" because he "did [his] work on this already." (Filing No. 92, Ex. 102 at 24, 25.) Taking what Investigator Bolte described as the "one chance to tru[thfully] give [him] [his] side of the story," Defendant admitted that he gave Mr. Rohde the pill. (Filing No. 92, Ex. 102 at 25, 26.) And after Investigator Bolte told him that should charges be filed against him, "it's going to look a hell of a lot better to a jury or to a judge or to whoever" to tell the truth, Defendant admitted that he gave Mr. Rohde the pill the same night he took it—not three months before as he first claimed. (Filing No. 92, Ex. 102 at 36, 37.)

At another point in the interview, Defendant used his cell phone to try pinning down the date he bought the pill and to see if he had a picture of the pill. (Filing No. 92, Ex. 102 at 28-29.) That prompted Investigator Bolte to remark that the phone was "going to have to come with [him],"

---

[1] As Defendant points out, Investigator Bolte told him near the beginning of the interview that he "had not spoken to anybody else" regarding Mr. Rohde's overdose. (Filing No. 97 at 21.) That was not true, however—Investigator Bolte spoke to "Mr. Rohde's girlfriend" Haley Buchholz prior to his interview with Defendant. (Filing No. 97 at 21; Filing No. 92, Ex. 101.) Investigator Bolte conceded as much at the evidentiary hearing. (Filing No. 97 at 20-21.)

and Defendant agreed to hand over his phone. (Filing No. 92, Ex. 102 at 30.) Investigator Bolte told Defendant that while he could ask for consent to search the phone, he was "not going to do that." (Filing No. 92, Ex. 102 at 30.) Instead, Investigator Bolte advised he was "going to do it the legal way" by "get[ting] a search warrant[.]" (Filing No. 92, Ex. 102 at 30.) Assuming he was successful in getting a warrant, Investigator Bolte stated that he would "probably download [the contents of the phone] next week"—though the police would still have to keep the phone "for evidence until the county attorney" authorized them to release it back to Defendant. (Filing No. 92, Ex. 102 at 30.)

Following those statements, Defendant asked what would happen if he "let [the police] download" his phone anyway. (Filing No. 92, Ex. 102 at 31.) Investigator Bolte reiterated his belief that obtaining consent for the search was "not the right thing for [him] to do" under these circumstances but offered to "ask somebody above [him] to see what they think[.]" (Filing No. 92, Ex. 102 at 31.) The interview continued, but Investigator Bolte eventually left the room to talk to the "guy that downloads the cell phones[.]" (Filing No. 92, Ex. 102 at 45.) Upon his return, Investigator Bolte relayed that "if [Defendant] [was] willing to give consent for a download" of the phone, "we can do it that way." (Filing No. 92, Ex. 102 at 45.) Investigator Bolte told Defendant that giving consent for the search of his phone was "a hundred percent" his decision, and that Defendant "[did not] have to" do so. (Filing No. 92, Ex. 102 at 45.) Defendant responded by asking whether he could "call [his] attorney first to make sure" it was "safe" to consent to the search. (Filing No. 92, Ex. 102 at 45.) Investigator Bolte allowed him to do so, but Defendant was unable to reach his attorney. (Filing No. 97 at 9.) Investigator Bolte again advised that it was "okay" if Defendant did not give consent for the search—he would then "apply for a search warrant[.]" (Filing No. 92, Ex. 102 at 49.) This time, Defendant verbally gave Investigator Bolte consent to conduct the search. (Filing No. 92, Ex. 102 at 49.)

Investigator Bolte then produced a Consent to Search Cellular Telephone form and walked Defendant through completing it. (Filing No. 92, Ex. 2; Filing No. 97 at 10.) Investigator Bolte told Defendant he could withdraw his consent at any time by contacting him and provided his phone number. (Filing No. 92, Ex. 102 at 51.) Before he signed the form, Investigator Bolte asked Defendant if he understood everything in the form. (Filing No. 92, Ex. 102 at 51.) Defendant said "I mean, you're getting a warrant. You'll eventually get it any ways." (Filing No. 92, Ex. 102 at

3

51.) Investigator Bolte immediately clarified that he "can't say that" with certainty—while he would seek a warrant, there was no guarantee "a judge would sign it." (Filing No. 92, Ex. 102 at 51.) For his part, Investigator Bolte made clear that he did not want to "coerce [Defendant] into giving [him] consent." (Filing No. 92, Ex. 102 at 51.) Defendant asked whether he could "wait until Monday to sign [the form] when [he] talk[s] to [his] lawyer." (Filing No. 92, Ex. 102 at 52.) Again, Investigator Bolte told him that would be "fine." (Filing No. 92, Ex. 102 at 52.) Defendant asked if he would "get [his] phone back that day [when he got out of jail]" and Investigator Bolte responded "[t]here's no way you would be able to" because the police would seek a warrant at that point. (Filing No. 92, Ex. 102 at 52.) Yet, Investigator Bolte reminded Defendant the decision was "one hundred percent up to [him]" and that he was not "hurting [Investigator Bolte's] feelings either way" if he gave consent or withheld it. (Filing No. 92, Ex. 102 at 52.) Defendant responded by saying "I mean, anything to help." (Filing No. 92, Ex. 102 at 52.) Investigator Bolte filled out the remainder of the consent form, Defendant provided his passcode to the phone, and then signed the form. (Filing No. 92, Ex. 102 at 52; Filing No. 92, Ex. 2.)

## STANDARD OF REVIEW

Under 28 U.S.C. § 636(b)(1), different standards of review apply when, as here, a party objects to a pretrial decision or a proposed findings of fact and recommendations by a magistrate judge. "A judge of the court shall make a de novo determination of those portions . . . to which objection is made." *Id.*; *accord Gonzales-Perez v. Harper*, 241 F.3d 633, 636 (8th Cir. 2001) ("When a party timely objects to a magistrate judge's report and recommendation, the district court is required to make a de novo review of the record related to the objections . . ."). The reviewing district court judge is free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see* Fed. R. Crim. P. 59(b)(3). If desired, a reviewing district court judge may "receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

When a party contests a magistrate judge's findings that resulted from an evidentiary hearing, the reviewing district court judge does not need to conduct another hearing. *See United States v. Raddatz*, 447 U.S. 667, 674 (1980) (holding that 28 U.S.C. § 636 "calls for a de novo determination, not a de novo hearing"). Instead, the district court discharges its duty by, at a minimum, listening to a tape recording or reading a transcript of the evidentiary hearing. *See*

4

*United States v. Azure*, 539 F.3d 904, 910–11 (8th Cir. 2008). Here, the Court has read the transcript of the hearing and has reviewed the exhibits admitted there.

## DISCUSSION

Defendant objects to the "legal conclusion reached" in the Magistrate Judge's Findings and Recommendation. (Filing No. 102 at 1.) Specifically, he argues that the incriminating statements he made during the interview with Investigator Bolte and evidence seized through the search of his cell phone should be suppressed because (1) he invoked his right to counsel; (2) his waiver of *Miranda* rights was invalid; (3) his incriminating statements were involuntary; and (4) his consent to the search of his phone was involuntary. (Filing No. 102; Filing No. 103.)[2] The Court will address each argument in turn.

### 1. **Invocation of Right to Counsel**

Defendant first argues—without specifically saying how or when—that he "invoked his right" to counsel by "asking for his lawyer." (Filing No. 103 at 3.) Defendant maintains the continued "custodial interrogation" after that point was a "violation of [his] Fifth Amendment" rights. (Filing No. 103 at 3.) But after reviewing the transcripts of the interview and evidentiary hearing, the Court agrees with the Magistrate Judge that Defendant did not unequivocally invoke his right to counsel.

"[A] suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning." *Davis v. United States*, 512 U.S. 452, 457 (1994) (citing *Miranda v. Arizona*, 384 U.S. 436, 469–73 (1966)). "[I]f a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Id.* (citing *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981)). This rule "requires courts to 'determine whether the accused actually invoked his right to counsel.'" *Id.* at 459 (quoting *Smith v. Illinois*, 469 U.S. 91, 95 (1984)). Invocation of

---

[2] Defendant's brief raises issues and arguments not found in his "Objection to Findings, Recommendation and Order." (Filing No. 102.) NECrimR59.2(a) requires an objecting party to "specify (1) the parts of the order or findings and recommendations to which the party objects and (2) the legal basis of the objections" in a "Statement of Objections to Magistrate Judge's Order" or "Statement of Objections to Magistrate Judge's Findings and Recommendations[.]" The Court, however, will not exalt form over substance here and has considered each of the arguments raised in Defendant's brief as though they were properly asserted in a Statement of Objections.

the right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Id.* (citing *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)). "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning"—"[r]ather, the suspect must *unambiguously* request counsel." *Id.* (emphasis added). And "the Supreme Court has declined to adopt a rule requiring officers to clarify ambiguous requests for counsel." *United States v. Mohr*, 772 F.3d 1143, 1146 (8th Cir. 2014) (citing *Davis,* 512 U.S. at 461).

Here, the Court agrees with the Magistrate Judge's determination that Defendant did not invoke his right to counsel with sufficient clarity at any time. Consider the first potential invocation. Near the end of the interview, Defendant indicated he tried to call his attorney "earlier" and he "didn't answer."[3] (Filing No. 92, Ex. 102 at 46.) For his part, Investigator Bolte testified that he "didn't even hear" Defendant make that comment but conceded it was "possible" Defendant tried to call his lawyer while in the presence of Officer Hibberd. (Filing No. 97 at 34). Details of that interaction—like whether Defendant indeed placed a call to his attorney and what he said in front of Officer Hibberd—might have some bearing on the issues here. *See, e.g., United States v. Scalf,* 708 F.2d 1540, 1544 (10th Cir. 1983) ("[O]nce a suspect has invoked the right to counsel, knowledge of that request is imputed to all law enforcement officers who subsequently deal with the suspect."). As the Magistrate Judge noted, however, Defendant failed to present any evidence detailing his interactions with Officer Hibberd. (Filing No. 100 at 6 n.2, 10.) That evidentiary void leads the Court to find that Defendant did not invoke his right to counsel before the interview began.

The same is true of the only other possible invocations—when Defendant asked Investigator Bolte "[c]an I call my attorney first and make sure it's safe [to consent to the cell phone search] or—?" and "[c]an I wait until Monday to sign [the cell phone search consent form] when I talk to my lawyer?" during the interview. (Filing No. 92, Ex. 102 at 45, 52.) The Eighth

---

[3] Investigator Bolte testified that Defendant would have placed that call outside of his presence, before the interview began. (Filing No. 97 at 34.) The interview transcript confirms as much—it shows that Defendant did not mention calling his lawyer until near the end.

Circuit has held that similar questions are ambiguous and "insufficient to trigger an obligation to cease questioning." *United States v. Havlik*, 710 F.3d 818, 821 (8th Cir. 2013). *See, e.g., Dormire v. Wilkinson*, 249 F.3d 801, 805 (8th Cir. 2001) (holding "[c]ould I call my lawyer?" was ambiguous because a reasonable officer could have understood the suspect to be "merely inquiring whether he had the right to call a lawyer"); *United States v. Mohr*, 772 F.3d 1143, 1146 (8th Cir. 2014) (holding "'I think I should get [a lawyer]' was not an unequivocal invocation of [the defendant's] right to counsel"); *Havlik*, 710 F.3d at 821-22 (holding "I don't have a lawyer. I guess I need to get one, don't I?" and "I guess you better get me a lawyer then" were ambiguous and equivocal).

So too here. Under binding Eighth Circuit precedent, Defendant merely asking whether he could call his lawyer was not "an unequivocal invocation of his right to counsel." *Mohr,* 772 F.3d at 1146. The same is true of Defendant's second question—asking whether he could wait to sign the consent form until he speaks to his lawyer in the future is not enough. *See, e.g., Lord v. Duckworth,* 29 F.3d 1216, 1218, 1221 (7th Cir. 1994) (finding that a suspect's statement referencing "future access to counsel for a court hearing rather than a request for counsel at that time" insufficient to constitute an unequivocal request for counsel because it lacked "the clear implication of a present desire to consult with counsel"). And Investigator Bolte "could have reasonably believed in these circumstances that [Defendant] was merely inquiring whether he had the right to call a lawyer" to discuss his options "rather than believing that [Defendant] was actually requesting counsel." *Dormire,* 249 F.3d at 805. Investigator Bolte did not "prevent [Defendant] from calling an attorney," either. *Id.* In any event, Investigator Bolte had no obligation "to clarify" any "ambiguous requests for counsel." *Mohr,* 772 F.3d at 1146.

"Officers are only required to cease questioning if a suspect's request for an attorney is clear and unambiguous . . ." *Mohr,* 772 F.3d at 1145-46. Defendant's statements were neither. Thus, any incriminating statements he made following those questions need not—and will not—be suppressed.

2. **Waiver**

In his brief, Defendant also makes a passing reference to the validity of his *Miranda* waiver, arguing that it "suggests deceit, coercion, and a calculated maneuver to keep [him] from his legal counsel with the intent to play on [his] loyalty, emotions, and human decen[c]y to provide

7

information for medical purposes." (Filing No. 103 at 3-4.) As an initial matter, the Court doubts that Defendant's threadbare argument satisfies NECrimR 59.2(a), which requires an objecting party to "specify the parts of the order or findings and recommendations to which the party objects *and the legal basis of the objections*." Id. (emphasis added). And "[a] party's failure to state a legal argument supporting objections to an order may be considered an abandonment of the party's objections." Id. Defendant's brevity leaves the Court to guess as to what his legal arguments really are. But after conducting a de novo review of the evidence surrounding Defendant's waiver of *Miranda* rights, the Court agrees it was voluntary, knowing, and intelligent, and will overrule his objection on that basis.

"A defendant's waiver of his Miranda rights must be made voluntarily, knowingly, and intelligently." United States v. Duran, 109 F. Supp.3d 1093, 1102 (D. Minn. 2015). In evaluating whether a waiver was made voluntarily, knowingly, and intelligently, courts examine (1) whether the waiver was the product of a free and deliberate choice rather than intimidation, coercion, or deception and (2) whether the suspect waived his rights with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Id. And "[i]n considering whether a confession was voluntary, the determinative question is whether the confession was extracted by threats, violence, or promises (express or implied), such that the defendant's will was overborne and his or her capacity for self-determination was critically impaired." United States v. Pierce, 152 F.3d 808, 812 (8th Cir. 1998). In assessing voluntariness, courts look at the totality of the circumstances, including not only the conduct of the police, but also the defendant's ability to resist police pressure. Id. In evaluating the totality of the circumstances, courts also consider the defendant's maturity level, education, physical condition, and mental condition. United States v. Sanchez, 614 F.3d 876, 883 (8th Cir. 2010).

Here, the Court agrees that Defendant's waiver of his *Miranda* rights was made voluntarily, knowingly, and intelligently. As an initial matter, Defendant "signed a *Miranda* waiver form and '[t]his fact alone carries significant weight in determining whether his waiver was knowing and intelligent.'" United States v. Rooney, 63 F.4th 1160, 1168 (8th Cir. 2023) (quoting United States v. Gallardo, 495 F.3d 982, 991 (8th Cir. 2007)); (Filing No. 92, Ex. 1.) Defendant also testified he had his *Miranda* rights read to him at least "[o]ne time" before this interview for a charge stemming from "pills in [his] wallet." (Filing No. 92, Ex. 102 at 8.) And Defendant indicated he was on probation—and had been for about three months—at the time of the interview. (Filing No. 92, Ex.

8

102 at 8, 25.) Those "interaction[s] with the criminal justice system support[ ] an inference that an [Defendant] is familiar with his constitutional rights and that his statements to the police are voluntary." United States v. Vinton, 631 F.3d 476, 482 (8th Cir. 2011).[4] Finally, Investigator Bolte testified—and the interview transcript confirms—that he did not make any threats toward or promises to Defendant to induce the waiver. (Filing No. 97 at 6; Filing No. 92, Ex. 102 at 3-10.)

Also, nothing gives the Court pause regarding Defendant's "maturity, education, physical condition, and mental condition." United States v. Magallon, 984 F.3d 1263, 1284 (8th Cir. 2021). He was twenty-four years old at the time of the interview and there is no evidence contradicting the Magistrate Judge's finding that he possessed "at least average intelligence and education." (Filing No. 100 at 7.) There is no suggestion he was intoxicated or suffering from any physical or mental impairments. And Defendant "speaks English and there were no apparent issues with him understanding what he was being asked or with what he was saying." Rooney, 63 F.4th at 1168.[5]

Under the "totality of the circumstances," the Court concludes that Defendant's will was not "overborne" and that his waiver of *Miranda* rights was made voluntarily, knowingly, and intelligently. Id.

3. **Statements**

Defendant also contends that—despite having waived his *Miranda* rights—incriminating statements he made during the interview should be suppressed because they were "involuntarily and thus were obtained in violation of Defendant's Fifth Amendment Rights." (Filing No. 103 at 4.) He points to Investigator Bolte's "questioning tactics"—like "appeal[s]" to [Defendant's] close relationship with Mr. Rohde, making a misleading statement, and expressing "skepticism regarding [Defendant's] version of events"—to argue that his eventual confessions were "obtained

---

[4] Though no evidence detailing Defendant's criminal history was offered at the hearing, there is no dispute that Defendant was arrested on an unrelated charge just before the interview. (Filing No. 92, Ex. 102 at 3-6.) And Defendant mentioned taking a DNA test related to that arrest during the interview with Investigator Bolte. (Filing No. 92, Ex. 102 at 6.) A DNA test, of course, only happens through consent or if police obtain a search warrant—in either scenario, Defendant would have "interact[ed] with the criminal justice system," too. Vinton, 631 F.3d at 482.

[5] The Court notes that Investigator Bolte also asked Defendant to complete a written statement at the end of the interview, and Defendant declined to do so—he wanted to "write it with [his attorney] just to make sure [he said] the right stuff." (Filing No. 92, Ex. 102 at 54.) That shows Defendant was comfortable—and capable of—saying no to Investigator Bolte.

9

in violation of his right against self-incrimination and must be suppressed." (Filing No. 103 at 4.) The Court disagrees.

"Statements to law enforcement authorities are voluntary if they are the product of an essentially free and unconstrained choice by [their] maker . . . A statement is not considered involuntary unless the police extorted it from the accused by means of coercive activity." United States v. Vinton, 631 F.3d 476, 482 (8th Cir. 2011) (internal quotations and citations omitted). "The appropriate test for determining whether a statement or confession is voluntary is whether the alleged statement or confession was extracted by threats, violence, or direct or indirect promises, such that [an individual's] will is overborne and his . . . capacity for self-determination critically impaired." United States v. Gipp, 147 F.3d 680, 683 (8th Cir. 1998) (internal quotation omitted).

In making the voluntariness determination, courts consider "the totality of the circumstances," and assess "the conduct of law enforcement officials and the suspect's capacity to resist any pressure." United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995). Factors taken into consideration in performing this assessment include: (1) the suspect's age; (2) the suspect's intelligence and education; (3) whether the suspect was intoxicated or under the influence of drugs; (4) whether the suspect consented after being informed of his right to withhold consent or his Miranda rights; and (5) whether the suspect, because of having been previously arrested, was familiar with the protections afforded by the legal system. United States v. Griffith, 533 F.3d 979, 984 (8th Cir. 2008).

Here, Defendant's statements were made voluntarily. As discussed above, Defendant's age, intelligence and education, lack of intoxication, waiver of his *Miranda* rights, and experience with the protections afforded by the legal system all indicate voluntariness. See id. at 985. There is also no evidence—nor does Defendant allege—that his confessions were "extracted by threats, violence, or express or implied promises sufficient to overbear [his] will and critically impair his capacity for self-determination." Simmons v. Bowersox, 235 F.3d 1124, 1133 (8th Cir. 2001).

Further, none of Investigator Bolte's "questioning tactics" were improperly coercive. True, Investigator Bolte told Defendant that it would "look a hell of a lot better to a jury or to a judge or to whoever" to be truthful. (Filing No. 92, Ex. 102 at 36.) But as the Eighth Circuit has held, "[t]he statement to an accused that telling the truth 'would be better for him' does not constitute an

implied or express promise of leniency for the purpose of rendering his confession involuntary." *Simmons,* 235 F.3d at 1133. And Investigator Bolte was permitted to "elicit statements by claiming not to believe [Defendant's] denials." *Id.* The same is true of Investigator Bolte's "appeals" to Defendant's close relationship with Mr. Rohde. Merely telling Defendant that his best friend was "brain dead" in the hospital because of a pill Defendant gave him was no more than offering an "accurate representation[ ] of [Defendant's] predicament." *United States v. Santos-Garcia,* 313 F.3d 1073, 1079 (8th Cir. 2002). That was not improper.

That Investigator Bolte misled Defendant by telling him he had not talked to anyone else before the interview does not change the outcome, either. "[L]ie[s] to the accused about the evidence against him" does not "necessarily render a confession involuntary." *United States v. Santos-Garcia,* 313 F.3d 1073, 1079 (8th Cir. 2002) (quoting *Wilson v. Lawrence County,* 260 F.3d 946, 953 (8th Cir. 2001)). "Rather, the coercive conduct must be 'such that the defendant's will was overborne and his capacity for self-determination critically impaired.'" *Id.* The Court is unpersuaded those requirements are met here, primarily because Investigator Bolte abandoned the lie and told Defendant that he "kn[ew] who gave [Mr. Rohde] the pill already" through prior "work" on the case just before Defendant made the incriminating statements. (Filing No. 92, Ex. 102 at 25.) That was not the first time Investigator Bolte changed course, either—in fact, he initially told Defendant that he had "been talking to" other friends of Mr. Rohde's *before* he said he had not "talked to anybody yet."[6] (Filing No. 92, Ex. 102 at 4, 12.) Put simply, Investigator Bolte's misleading statement—sandwiched between two truthful statements contradicting it—cannot bear all the weight Defendant puts on it. If Defendant was "paying attention" to Investigator Bolte's questions, he would have quickly realized that Investigator Bolte was "lying to him" or "being inconsistent at best"—Defendant's counsel said as much at the evidentiary hearing. (Filing No. 97 at 22.)

In sum, the totality of the circumstances establishes that Defendant's incriminating statements were voluntarily made. *See Evans v. Dowd,* 932 F.2d 739, 742 (8th Cir. 1991) ("[U]pon the whole record, we cannot conclude that the officer's misstatement of the purpose of the

---

[6] In any event, Defendant did not seem to believe Investigator Bolte's lie. When Investigator Bolte intimated he had not spoken to anyone else before the interview, Defendant's response was "[r]eally?" (Filing No. 92, Ex. 102 at 12.)

11

interrogation, statements of disbelief, untrue suggestions of eyewitnesses, and statement that [the suspect] would be returned to his cell amount to unconstitutional coercion[.]"). The Court agrees this is not one of the "rare" cases where "a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda*[.]" *United States v. Vinton*, 631 F.3d 476, 483-84 (8th Cir. 2011).

**4. Consent to Search Cell Phone**

Defendant's last argument is that the consent he gave Investigator Bolte to carry out a search of his cell phone was "not valid" in that it was not "voluntarily given." (Filing No. 103 at 6.) That argument meets the same fate as the first three.

"A defendant's voluntary consent to be searched is an exception to the Fourth Amendment's warrant requirement." *United States v. Esquivel*, 507 F.3d 1154, 1160 (8th Cir. 2007). Consent is voluntary if it was "the product of an essentially free and unconstrained choice" by its maker. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). "This determination depends upon the totality of the circumstances in a particular case, including both the characteristics of the accused and the details of the interrogation." *United States v. Chaidez*, 906 F.2d 377, 380-81 (8th Cir. 1990) (internal quotation omitted).

The following characteristics of persons giving consent are relevant in assessing voluntariness: (1) their age, (2) intelligence and education, (3) whether they were intoxicated or under the influence of drugs, (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights, and (5) whether, due to previous arrests, they were aware of the protections afforded to suspects by the legal system. *Chaidez*, 906 F.2d at 381 (internal citations omitted). In examining the environment in which consent was given, courts should ask whether the individual who provided consent (1) was detained and questioned for a long or short time, (2) was threatened, intimidated or punished by police, (3) relied upon promises or misrepresentations made by police, (4) was in custody or under arrest when consent was given, (5) was in a public or a secluded place, or (6) either objected to the search or stood by silently while the search was performed. *Id.* (internal citations omitted). These factors are not to be applied mechanically, but serve as a guide. *Id.*

Here, the Court agrees that Defendant voluntarily consented to the search of his cell phone. Again, Defendant's individual characteristics—like his age, intelligence and education, lack of intoxication, waiver of his *Miranda* rights, and experience with the protections afforded by the legal system—all indicate voluntariness. *See id; see also United States v. Lee*, 356 F.3d 831, 834 (8th Cir. 2003) (holding that *Miranda* warnings "can lessen the probability that a defendant was subtly coerced" into consenting). Defendant suggests that he was not "fully aware of the consequences of consenting to the search of the phone" and was "not confident in his understanding of what his giving consent truly entailed." (Filing No. 103 at 9.) But the Court is hard-pressed to accept those contentions given the "Consent to Search Cellular Telephone" form Defendant read and signed. (Filing No. 92, Ex. 2.) That form told Mr. Bolte exactly what would happen if he gave consent (a "forensic examination of [his] cell phone, which may include incoming and outgoing call logs, photographs, videos, text messages, contact lists, or other documents . . .") and told him he had the right to "withdraw [his] consent at any time by contacting"[7] Investigator Bolte. (Filing No. 92, Ex. 2.) During the interview, Investigator Bolte told Defendant that he wanted him to "read everything [on the form] carefully," and there is no evidence suggesting Defendant did not do so. (Filing No. 92, Ex. 102 at 50.)

The environment where Defendant consented to a search similarly suggests voluntariness Again, there is no evidence that Defendant was "threatened, intimidated or punished" by Investigator Bolte. *Chaidez*, 906 F.2d at 381. True, he was "in custody" and "under arrest" for an unrelated offense when he consented to the search—but "even persons who have been arrested and are in custody can voluntarily consent to [a] search." *Id.* at 382.

Defendant's principal arguments on this issue again center on Investigator Bolte's tactics. He says that "Officer Bolte . . . suddenly demanded[8] that [Defendant's] surrender his phone" and "represented to [Defendant] that he would get a warrant" if Defendant did not consent to the search. (Filing No. 103 at 8.) And at first blush, that line of argument seems viable because a suspect's

---

[7] Investigator Bolte verbally gave Defendant his phone number and wrote it on the Consent to Search Cellular Telephone form. (Filing No. 92, Ex. 102 at 51; Ex. 2.)

[8] Defendant does not argue that his phone was illegally seized, and Investigator Bolte told Defendant that police would keep the phone for some time either way—whether the search was authorized by consent or search warrant. (Filing No. 92, Ex. 102 at 45, 52.)

13

"mere acquiescence to a claim of lawful authority" does not constitute voluntary consent. *United States v. Escobar*, 389 F.3d 781, 785 (8th Cir. 2004). But there are "no 'per se rules' . . . in this context." *United States v. Comstock,* 531 F.3d 667, 678 (8th Cir. 2008). "When a person consents to a search after officers state they will attempt to obtain a warrant if the person does not consent, the consent is not necessarily coerced . . . Instead, an officer's threat to obtain a search warrant is a factor to be considered when examining the *totality of the circumstances surrounding consent*." *United States v. Larson*, 978 F.2d 1021, 1024 (8th Cir. 1992) (emphasis added).

The totality of the circumstances here establishes that "[Defendant's] consent was voluntary rather than coerced." *Id.* Investigator Bolte repeatedly told Defendant that whether to consent to the search was "one hundred percent up to [him]" and that it was "okay" if he did not wish to do so. (Filing No. 92, Ex. 102 at 49.) And Investigator Bolte went to great lengths to clarify that it was not certain a judge would "sign" a warrant after Defendant indicated he thought police obtaining a warrant would be a foregone conclusion. (Filing No. 92, Ex. 102 at 51.) *See Larson,* 978 F.2d at 1024 (finding consent to search voluntary even though suspect told police—and they agreed—that "[they] will probably get a search warrant anyway.").

Defendant also faults Investigator Bolte for waiting until "much later" in the interview to "initiate discussions of consent to search the phone[.]" (Filing No. 103 at 8.) But the Court is unpersuaded that Investigator Bolte initially representing he would seek a warrant only to later seek consent somehow renders Defendant's consent involuntary. As noted above, Investigator Bolte told Defendant several times that he could give consent or withhold it—the choice was his. That those statements came later in the interview is of no moment. They are part of the "totality of the circumstances" in which consent was given. *Chaidez,* 906 F.2d at 380-81.

Defendant also contends that his consent was involuntary because it was "obtain[ed] . . . immediately follow[ing] a *Miranda* violation." (Filing No. 103 at 8.) That argument misses the mark twice over. The Court has already found that Defendant did not invoke his right to counsel, so there were no *Miranda* violations. And "[t]he Eighth Circuit has never held that a request to search must be preceded by *Miranda* warnings, or that a lack of *Miranda* warnings invalidates a consent to search." *United States v. Torres-Monje,* 433 F. Supp. 2d 1028, 1035-36 (D.N.D. 2006) (citing *United States v. Payne,* 119 F.3d 637, 643 (8th Cir.1997)). So even if there

14

was a *Miranda* violation, the Court disagrees that it would intrinsically "guarantee[ ] the impropriety of [Defendant's] consent" as Defendant argues. (Filing No. 103 at 9.)

In addition, as the Magistrate Judge noted—and this Court agrees—"a reasonable officer" in Investigator Bolte's position "would believe consent was given and can be inferred from [Defendant's] words, gestures, [and] other conduct" described above. United States v. Guerrero, 374 F.3d 584, 588 (8th Cir. 2004). This is another reason why Defendant's argument fails. *See* United States v. Sanchez, 156 F.3d 875, 878 (8th Cir. 1998).

To sum up, the evidence shows that Defendant did not invoke his right to counsel, his waiver of *Miranda* rights was valid, his incriminating statements were voluntarily made, and he voluntarily consented to the search of his cell phone. The Court will therefore deny Defendant's Amended Motion to Suppress.

Accordingly,

**IT IS ORDERED:**

1. Defendant's Objections (Filing No. 102) to the Magistrate Judge's Findings and Recommendation are overruled.
2. The Magistrate Judge's Findings and Recommendation (Filing No. 100) is adopted.
3. Defendant's Amended Motion to Suppress (Filing No. 71) is denied.

Dated this 22nd day of July, 2024.

BY THE COURT:

_Susan M Bazis_
Susan M. Bazis
United States District Judge